UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

SHANIKA R. DAVIS,             )
                                       )
             Plaintiff,        )
                                       )
          vs.                 )      No. 1:13-cv-01694-TWP-MJD
                                       )
CAROLYN W. COLVIN Acting      )
Commissioner of the Social Security   )
Administration,                )
                                       )
             Defendant.

## REPORT AND RECOMMENDATION

Shanika Davis ("Plaintiff") requests judicial review of the final decision of the

Commissioner of the Social Security Administration ("Commissioner") denying her applications

for Social Security Disability Insurance Benefits ("DIB") under Title II and Supplemental

Security Income ("SSI") under Title XVI of the Social Security Act ("the Act"). *See* 42 U.S.C.

§§ 416(i), 423(d), & 1382c(a)(3). For the reasons set forth below, the Magistrate Judge

recommends that the decision of the Commissioner be **AFFIRMED**.

### <u>Procedural History and Background</u>

On June 19, 2007, the Social Security Administration ("SSA") determined Plaintiff was

disabled as of May 31, 2007 and approved Plaintiff's applications for DIB and SSI. At the time,

Plaintiff suffered from affective disorder, fibromyalgia, and migraines. [R. at 12.] On February

23, 2011, the SSA terminated Plaintiff's benefits upon a determination that Plaintiff was no

longer disabled. Plaintiff at the time was thirty years old and suffered from mood disorder, depression, fibromyalgia, and migraines. [R. at 20.][1]

The SSA upheld the termination decision after a disability hearing conducted by a State agency Disability Hearing Officer. Plaintiff filed a request for a hearing, which occurred before Administrative Law Judge ("ALJ") Monica LaPolt on April 10, 2012. Plaintiff's attorney, Patrick Mulvany, and Vocational Expert Dewey Franklin were also present. [R. at 30.] The ALJ determined that Plaintiff's disability ended on February 23, 2011, and that Plaintiff had not become disabled again between that time and the time of the ALJ's July 24, 2012 decision.

The Appeals Council denied Plaintiff's request for review on September 10, 2013, thereby rendering the ALJ's decision final. Plaintiff filed her complaint for judicial review with this Court on October 23, 2013.

## Applicable Standard

Disability for the purposes of SSI and DIB is defined as "the inability to engage in any substantial gainful activity by reason of a medically determinable mental or physical impairment which can be expected to result in death, or which has lasted or can be expected to last for a continuous period of at least twelve months." 42 U.S.C. § 423(d)(1)(A).[2] In order to be found disabled, a claimant must demonstrate that her physical or mental limitations prevent her from doing not only her previous work, but any other kind of gainful employment that exists in the

---

[1] Plaintiff recited the relevant factual and medical background in more detail in her opening brief. [*See* Dkt. 22.] The Commissioner, unless otherwise noted herein, does not dispute these facts. [*See* Dkt. 27.] Because these facts involve Plaintiff's confidential and otherwise sensitive medical information, the Court will incorporate by reference the factual background in the parties' briefs and will articulate only specific facts as needed herein.

[2] In general, the legal standards applied in the determination of disability are the same regardless of whether a claimant seeks DIB or SSI. However, separate, parallel statutes and regulations exist for DIB and SSI claims. Therefore, citations in this opinion should be considered to refer to the appropriate parallel provision as context dictates. The same applies to citations of statutes or regulations found in quoted court decisions.

national economy, considering her age, education, and work experience. 42 U.S.C. § 423(d)(2)(A).

In determining whether a claimant who was found disabled continues to be disabled, the ALJ follows an eight-step process for a Title II claim and a seven-step process for a Title XVI claim. 20 C.F.R. §§ 404.1594, 416.994.

In the first step for the Title II claim, the ALJ must determine if the claimant is engaging in substantial gainful activity ("SGA"); if so, the claimant no longer is disabled. 20 C.F.R. § 404.1594(f)(1). For the Title XVI claim, the performance of SGA is not a factor used to determine if the claimant's disability continues. 20 C.F.R. § 416.994(b)(5).

If the claimant is not engaged in SGA, step two for the Title II claim and step one for the Title XVI claim require the ALJ to determine whether the claimant has an impairment or combination of impairments that meets or medically equals the criteria of an impairment listed in 20 CFR Part 404, Subpart P, Appendix 1. If the claimant does, her disability continues. 20 C.F.R. §§ 404.1594(f)(2); 416.994(b)(5)(i).

At step three for the Title II claim and step two for the Title XVI claim, the ALJ must determine whether medical improvement has occurred. 20 C.F.R. §§ 404.1594(f)(3); 416.994(b)(5)(ii). Medical improvement is any decrease in the medical severity of the claimant's impairment(s) that were present at the time of the most recent favorable medical decision that the claimant was disabled or continued to be disabled. 20 C.F.R. §§ 404.1594(b)(1); 416.994(b)(1)(i). If medical improvement has occurred, the analysis proceeds to the fourth step for the Title II claim and the third step for the Title XVI claim. If not, the analysis proceeds to the fifth step for the Title II claim and the fourth step for the Title XVI claim.

At step four of the Title II claim and step three of the Title XVI claim, the ALJ must determine whether the medical improvement is related to the ability to work. 20 C.F.R. §§ 404.1594(f)(4); 416.994(b)(5)(iii). If so, the analysis proceeds to step six of the Title II claim and step five of the Title XVI claim.

At step five for the Title II claim and step four for the Title XVI claim, the ALJ must determine if an exception to medical improvement applies. 20 C.F.R. §§ 404.1594(f)(5); 416.994(b)(5)(iv). There are two groups of exceptions. 20 C.F.R. §§ 404.1594(d), (e); 416.994(b)(3), (b)(4). If an exception from the first group applies, the analysis proceeds to the next step. If an exception from the second group applies, the claimant's disability ends. If no exception applies, the claimant's disability continues.

Step six for the Title II claim and step five for the Title XVI claim require the ALJ to determine whether all the claimant's current impairments in combination are severe. 20 C.F.R. §§ 404.1594(f)(6); 416.994(b)(5)(v). If all current impairments in combination do not significantly limit the claimant's ability to do basic work activities, the claimant no longer is disabled. If they do, the analysis proceeds to the next step.

At step seven for the Title II claim and step six for the Title XVI claim, the ALJ must assess the claimant's residual functional capacity based on the current impairments and determine if she can perform her past relevant work. 20 C.F.R. §§ 404.1594(f)(7); 416.994(b)(5)(vi). If the claimant has the capacity to perform past her relevant work, her disability has ended. If not, the analysis proceeds to the last step.

At the last step, the ALJ must determine whether other work exists that the claimant can perform, given her residual functional capacity ("RFC") and considering her age, education, and past work experience. 20 C.F.R. §§ 404.1594(f)(8); 416.994(b)(5)(vii). If the claimant can

perform other work, she is no longer disabled. If the claimant cannot perform other work, her disability continues.

On review of the ALJ's decision, the ALJ's findings of fact are conclusive and must be upheld by this Court "so long as substantial evidence supports them and no error of law occurred." *Dixon v. Massanari*, 270 F.3d 1171, 1176 (7th Cir.2001). "Substantial evidence means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion," *id.*, and this Court may not reweigh the evidence or substitute its judgment for that of the ALJ. *Overman v. Astrue*, 546 F.3d 456, 462 (7th Cir.2008). The ALJ "need not evaluate in writing every piece of testimony and evidence submitted." *Carlson v. Shalala*, 999 F.2d 180, 181 (7th Cir.1993). However, the "ALJ's decision must be based upon consideration of all the relevant evidence." *Herron v. Shalala*, 19 F.3d 329, 333 (7th Cir.1994). To be affirmed, the ALJ must articulate her analysis of the evidence in her decision; while she "is not required to address every piece of evidence or testimony," she must "provide some glimpse into her reasoning . . . [and] build an accurate and logical bridge from the evidence to her conclusion." *Dixon*, 270 F.3d at 1176. The Court, that is, "must be able to trace the ALJ's path of reasoning" from the evidence to her conclusion. *Clifford v. Apfel*, 227 F.3d 863, 874 (7th Cir. 2000), *as amended* (Dec. 13, 2000).

### The ALJ's Decision

The ALJ first determined that the most recent favorable medical decision finding that Plaintiff was disabled was June 19, 2007. [R. at 12.] She noted that at this time, Plaintiff had the following medically determinable impairments: affective disorder, fibromyalgia, and migraines. [*Id.*] She also noted that at this time, Plaintiff's mental impairment met section 12.04 of 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d) and 416.920(d)). [*Id.*]

At step one of the Title II (DIB) analysis, the ALJ determined that as of February 23, 2011, the date that Plaintiff's disability ended, Plaintiff had not engaged in substantial gainful activity. [*Id.*] At step two of the Title II analysis and step one of the Title XVI (SSI) analysis, the ALJ determined that Plaintiff had the medically determinable impairments of mood disorder, depression, migraines, and fibromyalgia, but that Plaintiff's impairments did not meet or medically equal the severity of an impairment listed in 20 CFR Part 404, Subpart P, Appendix 1. [*Id.*] The ALJ specifically considered and rejected Listings 1.02 and 14.06 to account for Plaintiff's fibromyalgia; Listing 11.03 to account for Plaintiff's headaches; and Listing 12.04 to account for Plaintiff's mental impairments. [R. at 12-14.]

In considering Listing 12.04, the ALJ applied the SSA's special technique for evaluating mental impairments as set forth in 20 C.F.R. § 404.1520a. She thus considered the four "Paragraph B" criteria, and found that Plaintiff 1) had "mild restrictions" in activities of daily living; 2) had "moderate difficulties" in social functioning; 3) had "moderate difficulties" in concentration, persistence, or pace; and 4) had no episodes of decompensation. [R. at 13.] Because Plaintiff did not have "marked" restrictions in at least two areas, or a combination of repeated episodes of decompensation and "marked" restrictions in at least one area, the ALJ determined Listing 12.04 was not satisfied. [*Id.*]

At step three of the Title II analysis and step two of the Title XVI analysis, the ALJ determined that medical improvement had occurred as off February 23, 2011. [R. at 14.] She specifically noted numerous improvements in Plaintiff's "social functioning" and "concentration, persistence, or pace" as compared to Plaintiff's previous evaluation in 2007. [*Id.*]

The ALJ thus proceeded to step four of the Title II analysis and step three of the Title XVI analysis. She determined that the medical improvement was related to the ability to work

because, as of February 23, 2011, the Plaintiff's impairments no longer met or medically equaled the same listing that was met at the time of the original determination that Plaintiff was disabled. In particular, the claimant as of February 23, 2011 was "no longer markedly limited in any area of mental functioning," such that Listing 12.04 was no longer satisfied. [R. at 16.]

Because the medical improvement was related to the ability to work, the ALJ proceeded to step six of the Title II claim and step five of the Title XVI claim. She determined that although medical improvement had occurred, Plaintiff continued to have a "severe" impairment or combination of impairments. [*Id.*] The ALJ therefore proceeded to determine Plaintiff's residual functional capacity and concluded that as of February 23, 2011, Plaintiff had the RFC to perform sedentary work, except that Plaintiff could engage in:

> no climbing ladders, ropes or scaffolds; occasional climbing ramps and stairs, stooping, kneeling, crouching and crawling; frequent balancing. The hypothetical individual has the mental capacity to understand, remember and follow simple instructions. Within these parameters and in the context of performing simple, routine, repetitive, concrete, tangible tasks, the hypothetical individual is able to sustain attention and concentration skills to carry out work-like tasks with reasonable pace and persistence; no transactional interaction with the public.

[R. at 16-17.] Applying this RFC at step seven of the Title II claim and step six of the Title XVI claim, the ALJ determined Plaintiff could not perform her past relevant work. [R. at 20.] The ALJ thus proceeded to step eight of the Title II analysis and step seven of the Title XVI analysis and determined that a person of Plaintiff's age, education, work experience, and residual functional capacity could perform jobs such as "job surveillance system monitor," "circuit board assembler," and "eyedrop assembler." [R. at 20-21.] Because these jobs existed in significant numbers in the national economy, the ALJ concluded Plaintiff was not disabled as of February 23, 2011. [R at 21.]

**Discussion**

Plaintiff raises four issues on review. She first argues that substantial evidence does not support the ALJ's finding that she was no longer disabled because the ALJ only selectively considered numerous pieces of evidence. [Dkt. 22 at 8.] She then argues that the ALJ should have summoned a medical advisor to testify whether her combined mental impairments met or were medically equivalent to a Listing. [*Id.* at 15.] Next, she contends the ALJ's adverse credibility determination was patently erroneous and contrary to SSR 96-7p. [*Id.* at 18.] Finally, she claims that the ALJ did not properly account for Plaintiff's mental limitations in constructing Plaintiff's RFC. [*Id.* at 22.]

**A. Selective Consideration of Evidence**

Plaintiff contends the ALJ only "selectively considered" a June 2008 psychological report from Dr. Paul Martin; a September 2009 evaluation from Dr. Mary Papandria; a June 2011 psychological evaluation from Gallahue Mental Health Clinic; and an October 2011 psychological evaluation from Midtown Mental Health Center. [*Id.* at 8-11.] She also argues that the ALJ "ignored" May 2010 and May 2011 psychotherapy reports from Gallahue Mental Health Clinic and "erroneously rejected" an evaluation from Dr. Elizabeth Brater. [*Id.* at 9-10.]

As noted above, the "ALJ's decision must be based upon consideration of all the relevant evidence." *Herron*, 19 F.3d at 333. Also, the ALJ "may not ignore an entire line of evidence that is contrary to the ruling." *Golembiewski v. Barnhart*, 322 F.3d 912, 917 (7th Cir. 2003). The ALJ, however, "need not evaluate in writing every piece of testimony and evidence submitted." *Carlson*, 999 F.2d at 181. The ALJ in this case complied with these requirements.

### 1. Dr. Martin's Report

The ALJ extensively discussed the 2008 report from Dr. Martin. [R. at 14 (citing R. at 766-69).] She noted that Plaintiff reported leading a fairly active lifestyle and was able to attend to her personal care, suggesting she was no longer disabled. [R. at 766.] The ALJ, however, also considered those aspects of the report indicating Plaintiff's limitations: she noted that Plaintiff "displayed a considerable impairment of concentration and substantial deficit in persistence," as well as "poor performance in mental arithmetic and memory function tests." [R. at 14.] She also noted that Dr. Martin considered Plaintiff to be a "poor candidate for significant vocational services." [*Id.* (quoting R. at 768).]

Plaintiff correctly states that the ALJ did not specifically mention that Dr. Martin diagnosed post-traumatic stress disorder, adjustment disorder, and pain disorder, [R. at 768], but the ALJ noted Plaintiff's pain and diagnoses elsewhere in the opinion, [R. at 15-16], and as stated above, the ALJ need not address every piece of evidence in writing. *See Carlson*, 999 F.2d at 181. Moreover, the ALJ's citation of those portions of Dr. Martin's report indicating Plaintiff's functional limitations indicate that the ALJ did not ignore the evidence contrary to her ruling, such that she did not err in considering Dr. Martin's report.

### 2. Dr. Papandria's Report

As with Dr. Martin's report, the ALJ extensively described Dr. Papandria's report and acknowledged both those aspects of the report indicating Plaintiff's functional capabilities and those aspects indicating her limitations. She noted that Plaintiff's thought processes and content were logical and coherent and that Plaintiff could come "to reasonable conclusions about relationships between events" and maintain "a connected flow of associations in which ideas follow each other in a comprehensible manner." [R. at 15 (quoting R. at 455).] The ALJ,

however, also noted that Plaintiff showed "impairment in reality testing capacity," a "limited ability to form close attachments to other people," and "ineffective maladaptive interpersonal behavior." [*Id.* (citing R. at 455-56).] She also specifically noted Plaintiff's diagnoses of delusional (paranoid) disorder, generalized anxiety disorder, and post-traumatic stress disorder. [*Id.*] Again, then, the ALJ considered the evidence contrary to her conclusion that Plaintiff was not disabled, undercutting Plaintiff's contention that the ALJ only selectively considered the medical record.

### 3. Gallahue Reports

The May 2010 Gallahue report indicates that Plaintiff had stress "related to children being removed from her custody by [the Department of Child Services ("DCS")]," and that DCS was requiring a psychological evaluation. [R. at 735.] Plaintiff faults the ALJ for omitting a reference to the removal of Plaintiff's children, [Dkt. 22 at 9], but the ALJ at the hearing asked Plaintiff whether DCS "was still involved with" Plaintiff's children. [R. at 45.] Plaintiff reported that her DCS file had been closed and that she now shared joint custody of her oldest child with the child's father.[3] [*Id.*] Based on this questioning, the ALJ was aware of Plaintiff's involvement with child services, such that she did not "ignore" this "line of evidence." *Golembiewski*, 322 F.3d at 917. Her failure to specifically reference the May 2010 Gallahue report therefore is not fatal to her decision.

Next, Plaintiff asserts the ALJ "ignored" the May 2011 Gallahue "psychotherapy" and "only selectively considered" the June 2011 Gallahue report. [Dkt. 22 at 9.] In analyzing Plaintiff's RFC, the ALJ noted that on "April 1, 2011, [Plaintiff stated] that her depression was in the past," but then "resumed treatment at Gallahue Mental Health on June 13, 2011." [R. at

---

[3] Records from the June 2011 Gallahue appointment also confirm that "DCS involvement has been closed." [R. at 728.]

18]. In this respect, Plaintiff is correct that the ALJ ignored the May 2011 "psychotherapy" at Gallahue Mental Health Clinic. [*See* R. at 18, 731.] In reality, however, the May 2011 "psychotherapy" consisted of a telephone call to the clinic to schedule the June 2011 appointment, and involved no actual provision of medical services. [R. at 731.]

The ALJ then extensively discussed the June 2011 evaluation: she observed that Plaintiff reported hallucinations and complained of "depressed mood, irritable mood, sleep disturbance, feelings of worthlessness, decreased concentration, recurrent thought of death or suicidal ideation, helplessness and hopelessness." [R. at 18 (citing R. at 727-30).] At the same time, however, the ALJ noted that Plaintiff's mental status examination showed "logical," "sequential," and "goal directed" thought processes. [*Id.*] Thus, the ALJ again considered both the portions of the report indicating disability and those suggesting no disability, such that she did not selectively consider the evidence or otherwise "ignore an entire line of evidence" contrary to her decision. *Golembiewski*, 322 F.3d at 917.

The ALJ also noted that the June 2011 appointment showed that Plaintiff had "no psychosis." [R. at 18.] Plaintiff is especially critical of this observation and notes that the examining physician reported that "psychotic features were present." [Dkt. 22 at 10 (quoting R. at 728).] The doctor, however, also specifically stated that Plaintiff's thought process showed "no psychosis." [R. at 729.] It is the province of the ALJ—not the Court—to weigh conflicting evidence, *see Overman*, 546 F.3d at 462, and this Court will therefore not disturb the ALJ's apparent decision to grant more weight to the examining doctor's conclusion that, despite the presence of "psychotic features," Plaintiff did not exhibit psychosis. Remand therefore is not required for a reassessment of the Gallahue reports.

### 4. Midtown Mental Health Center Report

During an appointment in October 2011 at Midtown Mental Health Center, Plaintiff reported that she was "receiving threats from a family of a man [Plaintiff's brother] killed in self-defense." [R. at 866.] She stated that she had nightmares, fear, anxiety, and difficulty concentrating. [*Id.*] She also reported auditory hallucinations that had lasted for several years and panic attacks that lasted for hours at a time and occurred "a couple times a day." [R. at 867.]

The ALJ discussed these reports, [R. at 18], and thus, contrary to Plaintiff's assertion, did not "selectively consider[]" the October 2011 evaluation. Moreover, the ALJ noted that Plaintiff was cooperative; showed a "logical, relevant and goal directed" thought process; showed no abnormal thought content; and demonstrated appropriate affect. [*Id.* (citing R. at 868.).] The ALJ also observed that the examining physician assigned a Global Assessment of Functioning score of 61, indicating "mild symptoms," and that the physician recommended only "brief" treatment for Plaintiff's complaints. [*Id.* (citing R. at 869).] The ALJ's discussion of this evaluation thus demonstrates that she considered both the evidence supporting a finding of disability and the evidence supporting the ALJ's later finding of no disability. This Court "may not reweigh the evidence or substitute its judgment for that of the ALJ," *Overman*, 546 F.3d at 462, and thus will not overrule the ALJ's decision to give more weight to the portions of the report supporting the ALJ's conclusion.

The decision to refrain from upsetting the ALJ's findings is especially appropriate because many of the complaints alleged in the October 2011 report are derived from Plaintiff's own statements, rather than independent medical evidence. [*See* R. at 866-67.] An ALJ need not accord significant weight to such reports where, as here,[4] the ALJ finds that the claimant is not

---

[4] The ALJ's credibility determination is discussed more fully below.

entirely credible, *see, e.g.*, *Brihn v. Astrue*, 582 F. Supp. 2d 1088, 1101 (W.D. Wis. 2008) *aff'd*, 332 F. App'x 329 (7th Cir. 2009), such that this Court is disinclined to disturb the ALJ's weighing of the evidence.

### 5. Dr. Brater's Report

Plaintiff finally argues that the ALJ "ignored and erroneously rejected" Dr. Brater's January 2011 "psychological evaluation." [Dkt. 22 at 9.] At the outset, the Court notes that Dr. Brater completed a medical evaluation, not a psychological evaluation. [R. at 539-40.] Further, the ALJ discussed Dr. Brater's report and explained why she gave it little weight. [R. at 19.] In particular, Dr. Brater stated Plaintiff should be limited to lifting ten pounds infrequently; limited to walking, sitting and standing four hours per day; and limited to manipulating objects only occasionally. [R. at 541.] During the exam, however, Plaintiff had no difficulty walking, had normal grip strength, and had no difficulty manipulating objects. [R. at 540-41.] Further, the ALJ noted that Plaintiff's treating physician, Dr. Chrystal Anderson, found Plaintiff could function with fewer physical restrictions than did Dr. Brater. [R. at 19.] The Court thus concludes that, rather than "erroneously reject[ing]" Dr. Brater's report, the ALJ properly gave the report little weight because Dr. Brater's conclusions were not well supported by other evidence in the record. *See, e.g.*, *Schrader v. Colvin*, No. 13-2101, 2014 WL 4375930, at *3 (C.D. Ill. Sept. 4, 2014) (approving ALJ's decision to give little weight to examining physician's opinion that was inconsistent with "normal findings on examination" and "other evidence of record"). Plaintiff's contentions regarding Dr. Brater are therefore just as meritless as her other contentions regarding "selective consideration" of the evidence, such that Plaintiff's first argument does not require remand of the ALJ's decision.

### B. Failure to Summon a Medical Advisor

Plaintiff contends that the ALJ should have summoned a medical advisor "to testify whether the claimant's combined mental impairments . . . were medically equivalent to ay Listed impairment." [Dkt. 22 at 15.]

The Social Security Administration provides that an ALJ "must obtain an updated medical opinion from a medical expert" when 1) "no additional medical evidence is received, but in the opinion of the [ALJ] the symptoms, signs, and laboratory findings reported in the case record suggest that a judgment of equivalence may be reasonable;" or 2) "additional medical evidence is received that in the opinion of the [ALJ] may change the State agency medical or psychological consultant's finding" that impairments are not equivalent to a Listing. SSR 96-6p. In either situation, the ALJ has discretion to decide whether an updated medical opinion is necessary. *See, e.g., Hall v. Barnhart*, No. 1:04-cv-1847-DFH-TAB, 2006 WL 3206096, at *8 (S.D. Ind. June 15, 2006).

Plaintiff in this case argues that the second situation outlined in SSR 96-6p applies because the record contains evidence post-dating the State agency reviewing physicians' opinions on equivalence. [Dkt. 22 at 15.] In particular, Dr. Donna Unversaw completed a Psychiatric Review Technique form February 22, 2011 and opined that Plaintiff's mental impairments did not meet or equal a listing. [R. at 549.] Dr. Kenneth Neville then completed a Psychiatric Review Technique form on April 26, 2011 and also opined that Plaintiff's mental impairments did not meet or equal a listing. [R. at 710.] Plaintiff contends these opinions are unreliable because they did not include consideration of later records dated May 6, 2011 and October 25, 2011. [*Id.*]

As described previously, the May 6, 2011 report is not a record of Plaintiff's treatment; instead, it is the record of a telephone call in which Plaintiff scheduled a later appointment. [R. at 731.] The record from the ensuing appointment is dated June 13, 2011, and describes symptoms such as a depressed mood, sleep disturbances, decreased concentration, and feelings of helplessness. [R. at 727.] The October 25, 2011 report likewise describes "symptoms of depression," such as poor energy and trouble with concentration. [R. at 866.]

At step two of the Title II analysis and step one of the Title XVI analysis, the ALJ extensively considered Plaintiff's mental impairments and whether they met or equaled Listing 12.04. [R. at 12-14.] She specifically cited the June 13, 2011 report and noted that Plaintiff's depressive symptoms had no effect on Plaintiff's activities of daily living. [R. at 13 (citing R. at 729).] She also recounted the findings from the October 25, 2011 report and noted that Plaintiff "reached out to others without expecting anything in return" and was "working at the [YMCA] as a mentor to teenage boys." [R. at 13.] She then incorporated these findings in her assessment of Plaintiff's social limitations. [*Id.*] This portion of the ALJ's opinion thus indicates that the ALJ considered the evidence post-dating the State agency determinations, but that, "in the opinion of the [ALJ]," the "additional medical evidence" would not have "change[d] the State agency medical or psychological consultant's finding" on equivalence. SSR 96-6p. As such, the ALJ acted within her discretion in deciding not to summon a medical advisor for an updated evaluation on equivalence.

In her reply, Plaintiff contends that regardless of the ALJ's consideration of this later-received evidence, the ALJ erred because "it was the ALJ who reviewed the evidence, not a physician." [Dkt. 29 at 6.] Plaintiff is correct that a medical opinion on equivalence is typically necessary. The SSA, for instance, states that "longstanding policy requires that the judgment of a

physician (or psychologist) designated by the Commissioner" be received in the record "on the issue of equivalence." SSR 96-6p. Here, however, the Commissioner notes that the State agency physicians completed Disability Determination and Transmittal forms, [Dkt. 27 at 15 (citing R. at 59-60), which "conclusively establish that 'consideration by a physician . . . designated by the Commissioner has been given to the question of medical equivalence at the initial and reconsideration levels of administrative review.'" *Scheck v. Barnhart*, 357 F.3d 697, 700 (7th Cir. 2004) (citation omitted). Thus, the record did in fact contain the medical opinions required by SSR 96-6p.

In addition, the SSA provides that the "administrative law judge or Appeals Council"— rather than a physician—"is responsible for deciding the ultimate legal question whether a listing is met or equaled." SSR 96-6p. Thus, an ALJ may properly decide that the existing evidence is sufficient to make an equivalence determination. *See, e.g.*, Hall, 2006 WL 3206096, at *8 ("The ALJ acted within his discretion in deciding that the existing evidence was sufficient to make a finding about Ms. Hall's disability."). In short, the record in this case included medical opinions on the issue of equivalence, and the ALJ properly determined that the later-received evidence was unlikely to change those opinions. Hence, the ALJ did not err in not summoning a medical advisor to provide an updated opinion.

### C. The ALJ's Adverse Credibility Determination

Plaintiff argues that the ALJ's negative credibility determination was patently erroneous "because it was illogical." [Dkt. 22 at 19.] The ALJ stated:

> After considering the evidence of record, the undersigned finds the claimant's current medically determinable impairments could reasonably be expected to produce the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent they are inconsistent with the residual functional capacity assessment for the reasons explained below.

[R. at 17.] Plaintiff notes that the Seventh Circuit has previously disapproved of this sort of "boilerplate credibility determination" because it implies that "the ability to work is determined first and is then used to determine the claimant's credibility." [Dkt. 22 at 25 (quoting *Bjornson v. Astrue*, 671 F.3d 640, 645 (7th Cir. 2012)).]

The Seventh Circuit, however, has also noted that the presence of such boilerplate is not necessarily fatal to the ALJ's credibility determination. In *Pepper v. Colvin*, for instance, the court approved an ALJ's credibility determination—notwithstanding his use of boilerplate—when the ALJ also discussed the conflict between the claimant's statements, the claimant's activities of daily living, and the medical evidence of record. *Pepper v. Colvin*, 712 F.3d 351, 368 (7th Cir. 2013). The ALJ's discussion allowed the court to "sufficiently examine what the ALJ relied on when concluding [the plaintiff] was not fully credible," such that ALJ's adverse credibility finding was appropriate. *Id.* at 368-69.

The present case is more like *Pepper* than *Bjornson*. Here, the ALJ considered the medical evidence and explained numerous inconsistencies between the medical record and Plaintiff's statements, as well as inconsistencies within Plaintiff's statements. The ALJ, for instance, extensively discussed Plaintiff's mental health evaluation in October 2011. [R. at 18.] There, Plaintiff complained that she was "hypervigilant," was "afraid of people," was worried that others were watching her, and was constantly on guard against threats. [R. at 866.] At the same appointment, however, Plaintiff stated that she "reaches out to help others" and "everyday looks for good deeds to do for others." [R. at 868.] Similarly, she reported difficulty concentrating and focusing, but the doctor reported a "logical, relevant, goal-directed" thought process and "no abnormal [thought] content." [R. at 866, 868.] Finally, she complained of hallucinations and daily panic attacks that lasted for hours at a time, but the examining doctor

assigned a Global Assessment of Functioning ("GAF") score of 61, indicating only "mild" limitations in social, occupational, and school functioning, and recommended only brief treatment. [R. at 18 (citing R. at 869).] In short, Plaintiff's complaints at the October 2011 appointment were inconsistent with the rest of the examination.

The ALJ also discussed inconsistencies between Plaintiff's complaints and her activities of daily living. [R. at 13.] In December 2010, for instance, Plaintiff complained that she had difficulty getting out of bed because of her physical pain and had such little energy that she was "extremely tired after folding 4-5 towels." [R. at 225, 227.] At the same time, however, Plaintiff stated that she did "everything" for her children, including cooking, cleaning, and giving baths. [R. at 226.] She also reported that she enjoyed "exercising," "swimming," and "walking." [R. at 229.] Then, in June 2011, Plaintiff complained that her fibromyalgia and migraines caused "constant and intense pain" and stated that "she just want[ed] to rest." [R. at 729.] Nonetheless, Plaintiff's doctor reported that Plaintiff had no problems whatsoever with activities of daily living. [*Id.*] The ALJ discussed these inconsistencies, [*see, e.g.*, R. at 13], and ultimately concluded that the claimant's "allegations concerning the frequency and severity of her symptoms and limitations are not consistent with the objective medical evidence and other evidence of record and are not fully credible." [R. at 20.]

Hence, regardless of the boilerplate in the ALJ's opinion, the court can readily "examine what the ALJ relied on when concluding [the claimant] was not fully credible." *Pepper*, 712 F.3d at 368. The discrepancies between Plaintiff's complaints, Plaintiff's activities, and the medical evidence support the ALJ's conclusion, such that her credibility determination was not "patently erroneous" and must be upheld. *See id.* at 369.

**D. The ALJ's Step Five Conclusion**

Plaintiff finally argues that substantial evidence does not "support the ALJ's erroneous Step 5 determination that Shanika Davis was not disabled because she could perform some jobs." [Dkt. 22 at 22.] As noted above, the ALJ did not actually proceed through step five of the sequential evaluation process for Plaintiff's Title II claim, as the ALJ determined at step four that Plaintiff's medical improvement was related to the ability to work. [*See* R. at 16.] Plaintiff appears to actually attack the ALJ's RFC analysis at step seven of Plaintiff's Title II claim and step six of Plaintiff's Title XVI claim. [*See* Dkt. 22 at 25.]

During the RFC analysis, the ALJ in this case limited Plaintiff to "performing simple, routine, repetitive, concrete, tangible tasks." [R. at 17.] Plaintiff argues that this limitation was insufficient to account for Plaintiff's mental impairments. Specifically, Plaintiff notes that at step two of the Title II analysis and step one of the Title XVI analysis, the ALJ considered Paragraph B of the special technique for evaluating mental impairments, and determined that Plaintiff's mental impairments caused "moderate" difficulties in both "social functioning" and "concentration, persistence or pace." [R. at 13.] Plaintiff then contends that limiting Plaintiff to "simple, routine, repetitive, concrete tangible tasks" does not sufficiently account for these "moderate" difficulties. [Dkt. 22 at 25.]

Plaintiff's argument misapprehends the nature of the ALJ's finding of "moderate" difficulties. [R. at 13.] The SSA specifically provides that "the limitations identified in the 'paragraph B' and 'paragraph C' criteria are not an RFC assessment but are used to rate the severity of mental impairment(s) at steps 2 and 3 of the sequential evaluation process." SSR 96-6p. Thus, the finding of moderate restrictions at the earlier steps of the ALJ's analysis did not require that these limitations be imported into the ALJ's RFC analysis. Further, the SSA states

that in preparing a mental RFC, the ALJ should provide a "detailed assessment" of the Plaintiff's mental functioning with reference to the areas summarized on the SSA's Psychiatric Review Technique Forms. SSR 96-6p. Here, the ALJ discussed Plaintiff's mental limitations at length, [R. at 18], and specifically considered the Psychiatric Review Technique Forms completed by the non-examining State Agency medical consultants. [R. at 19.] She thus complied with SSR 96-6p, such that Plaintiff has not articulated a basis for remand of the ALJ's opinion.

Finally, the Court observes that Plaintiff has not explained what limitations the ALJ should have included in her mental RFC assessment, nor has Plaintiff explained why the limitations the ALJ did impose were insufficient to address Plaintiff's impairments. [*See* Dkt. 22 at 22-24.] As the Commissioner notes, it is the party that seeks to have an agency ruling set aside that "carries the burden of showing that prejudice resulted." [Dkt. 27 at 20 (quoting *Shinseki v. Sanders*, 556 U.S. 396, 409 (2009).] Without such a showing, Plaintiff has not carried her burden, such that once again, remand is not required.

## Conclusion

For the foregoing reasons, the Court finds that substantial evidence supports the ALJ's decision that Davis is no longer disabled. The Magistrate Judge therefore recommends that the Commissioner's decision be **AFFIRMED**. Any objections to the Magistrate Judge's Report and Recommendation shall be filed with the Clerk in accordance with 28 U.S.C. § 636(b)(1) and Fed. R. Civ. P. 72(b), and failure to timely file objections within fourteen days after service shall constitute a waiver of subsequent review absent a showing of good cause for such failure.

Date:  12/24/2014

Mark J. Dinsmore
United States Magistrate Judge
Southern District of Indiana

Distribution:

Patrick Harold Mulvany
patrick@mulvanylaw.com

Thomas E. Kieper
UNITED STATES ATTORNEY'S OFFICE
tom.kieper@usdoj.gov